Robert QUARLES, Plaintiff,

v.

NORTH MISSISSIPPI RETARDATION
CENTER et al., Defendants.

No. WC 75-89-S.

United States District Court,
N. D. Mississippi, W. D.

Jan. 9, 1978.

Affirmed, 5 Cir., 580 F.2d 1051.

Lewis Myers, Jr., North Miss. Rural Legal Services, Oxford, Miss., Johnny Walls, McTeer, Walls, Bailey & Buck, Greenville, Miss., for plaintiff.

James Ward, Ward & Ward, Starkville, Miss., James Brantley, Dept. of Mental Health, Miss. State Hospital, Whitfield, Miss., A. F. Summer, Atty. Gen., Jackson, Miss., for defendants.

## MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This action was submitted to the court for decision on the merits at a hearing held in the United States Courthouse in Oxford, Mississippi, on December 7, 1977. There was no live testimony presented at the time. The case was submitted on the record including exhibits in the file and transcript of the testimony introduced by the parties at the hearing for a preliminary injunction on October 30, 1975.

Plaintiff filed his complaint October 23, 1975, invoking the jurisdiction of this court

pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e, et seq., and 28 U.S.C.A. § 1343(3) and (4). Plaintiff seeks equitable relief to redress alleged deprivations of rights secured and protected by Title VII of the Civil Rights Act of 1964, the Thirteenth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C.A. §§ 1981 and 1983.

Defendants are 12 in number, being the Director of the North Mississippi Retardation Center, a state institution; Director of the Division of Retardation, State Department of Mental Health; the Executive Director of the State Department of Mental Health, the Chairperson and eight other members of the State Board of Mental Health.

Plaintiff sought by way of the complaint reinstatement as an employee of the Center, at a rate of pay commensurate with his education, training, experience and equal to that of white employees similarly situated, injunctive relief from personal harassment and for the protection of black employees as a group from racial discrimination in employment practices. Plaintiff also sought back pay allowances, punitive damages, and attorney's fees.

The court has reviewed the transcript aforesaid, the exhibits received in evidence, the contents of the jacket file and the proposed findings of fact and conclusions of law presented by the parties in reaching a decision in the case.

This memorandum of opinion will include the findings of fact and conclusions of law adopted by the court pursuant to Fed.R. Civ.P. 52(a).

Plaintiff Quarles is a member of the black race, and prior to the night of October 2, 1975, had been, for a period of about two years, in the employment of the North Mississippi Retardation Center (hereafter "Center"), at Oxford, Mississippi.

Plaintiff was employed by the Center on September 20, 1973. He was assigned the position of recreation aide, parttime, at $1.65 per hour. Plaintiff resigned March 31, 1974, and was rehired as a fulltime attendant at $2.00 per hour on June 3, 1974.

On July 1, 1974, his name was submitted to the Mississippi Classification Commission under the Classification Commission regulations and procedures for promotion to Cottage Parent 2 (shift supervisor). The Commission has established minimum job requirements for each position. The Classification Commission held authority to approve or disapprove promotions submitted by state agencies. The minimum requirements for Cottage Parent 2 are as follows: "graduation from a standard four year high school and one year of successful fulltime paid employment in work related to the above described duties." Plaintiff did meet the high school requirement, but was disapproved by the Classification Commission as he did not have one year's experience. Plaintiff had only six months experience at the time of submission of his name. Plaintiff's name was re-submitted for promotion to Cottage Parent 1, which required only high school graduation and no work experience. This promotion was approved by the Classification Commission and became effective August 1, 1974, with an increase in pay from $2.00 per hour to $366.00 per month. On July 1, 1975, the Legislature granted a three percent cost of living raise to state employees. Plaintiff was granted this increase from $366.00 per month to $396.00 per month. Plaintiff was resubmitted for promotion to Cottage Parent 2 (shift supervisor) on July 25, 1975. This was approved by the Department of Mental Health Merit System under which the Institution was then operating. This promotion became effective August 1, 1975. Plaintiff's pay was increased from $396.00 per month to $436.00 per month. All of these promotions, raises, etc., were fully explained by members of the North Mississippi Retardation Center staff to plaintiff.

Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission (hereafter "EEOC") on July 24, 1975. In the complaint, plaintiff stated:

I am a black employee of North Mississippi Retardation Center. I worked as a

supervisor, but do not get the pay that was promised. They tell me now I don't have enough experience, but I know some with less experience and are getting the salary. They also informed me that it didn't go through Jackson but they worked me a year. I would not have known that it didn't go through if I had not confronted them about my raise. I will attach a paper to this explaining more.

The attachment reads:

I feel like they discriminated against me because when I started to work, I had my high school diploma, but I know some one that has taken the G.E.D. test so that she could get the job. We filled out the application about the same time. But they said they lost mine. I don't understand why they didn't loose her papers. Now they are telling me my position was not passed in Jackson. I don't understand why they worked me as a supervisor for over a year. I must be qualified, I am still working as a supervisors. I will not go along with them in wrong doing.

At the request of plaintiff's attorney, the Civil Rights Division of the Department of Justice for the United States through the Assistant Attorney General in charge of the division issued plaintiff a right-to-sue letter on September 30, 1975.

Plaintiff filed yet another charge with EEOC on October 5, 1975, in which he stated:

Because I filed a charge of discrimination against NMRC with the EEOC, I was unfairly harassed and then fired without a reason.

At the time the complaint was filed, the October 5, 1975, charge had not been processed by the EEOC.

During the critical period involved herein, plaintiff was assigned as a Cottage-Life Shift Supervisor at Woodlea Cottage. He was supervisor of the "C" shift with hours from 10:00 P.M. to 6:30 A.M. The "A" and "B" shifts covered the balance of the 24 hour period. During the "A" and "B" shifts, hot meals were available to cottage workers on the campus of the Center in the cafeteria, or otherwise. However, hot meals were not available on campus for "C" shift workers.

On occasions, one or more members of the "C" shift would leave the campus to secure hot food for shift workers. This practice was deemed by management to be detrimental to supervision of cottage inmates during the "C" shift. An effort had been made to acquaint plaintiff with an unwritten rule in this respect.

A change was made in the position of Director of the Center on September 1, 1975. Mr. Albert R. Hendrix (hereafter "Hendrix") assumed this position on that day but arrived at the Center on August 15, 1975.

After Mr. Hendrix assumed the duties of his office, plaintiff left the campus during hours of work, for the purpose of obtaining food. Hendrix decided to establish the rule by a written directive. To implement this decision he caused to be issued memoranda which read as follows:

NORTH MISSISSIPPI RETARDATION CENTER

MEMORANDUM

DATE   10/1/'75

TO:        Director, Director of Cottage Life, Cottage
           Life Supervisors, "C" Shift Employees

FROM:      Glen Brown, Director of Personnel

SUBJECT: "C" Shift Meal Schedule Policy

Effective this date all "C" Shift employees will be required to take their 30-minute meal period between the hours of 1:30 and 2:30.  The one hour period will allow each cottage to stagger their meal schedules so that coverage will be maintained in each cottage at all times.

This policy further states that employees *will not* be permitted to leave the Center premises during their 30-minute meal period.  Employees will take their meal periods only in the Administration Building Canteen or kitchen area of their respective cottage.  With the exception of an emergency situation, an employee on his 30-minute meal period will not be required to perform any duties, whether active or inactive, while eating.  Failure to comply with established North Mississippi Retardation Center policies and procedures will initiate appropriate personnel action.

ym

Copy to Hugh Goforth

NMRC Director's Approval /s/ Randy Hendrix   /s/ 10/2/75
                         Randy Hendrix              Date

NORTH MISSISSIPPI RETARDATION CENTER

MEMORANDUM

DATE 10/1/'75

TO:        Director, Director of Cottage Life, Cottage
           Supervisors, "C" Shift Employees

FROM:      Glen Brown, Director of Personnel

SUBJECT: Policy Concerning "C" Shift Break Period

For clarification purposes, the "C" Shift is allowed as in the case of all shifts two 15-minute break periods.  The first break will fall after the first two hours of work and the second break will fall two hours before shift end. These break periods will be staggered by the respective cottage supervisor to ensure adequate cottage coverage.  The breaks will be taken either in the Administration Building Canteen or in the respective cottage kitchen area. Under no circumstances are employees to leave Center premises during these

periods, combine the two breaks, or visit in another work area. Failure to comply with established North Mississippi Retardation Center policies and procedures will initiate appropriate personnel action.

ym

Copy to Hugh Goforth

NMRC Director's Approval /s/ Randy Hendrix /s/ 10/2/75
                      Randy Hendrix       Date

On the "C" shift for cottage workers, Mr. Glen Brown, Director of Personnel (hereafter "Brown"), and Mr. Bill Lawhorn, Director of Cottage Life (hereafter "Lawhorn"), met with all "C" shift employees of Woodlea Cottage to explain the policy memoranda. The meeting was held in the breakroom of the cottage, at approximately 10:20 P.M. Plaintiff was present and participated in the meeting. The evidence shows that plaintiff opposed the regulation as being unfair and discriminatory in its application to "C" shift workers. There is some conflict in the evidence as to his conduct at the meeting. The evidence as a whole justified the conclusion that his vociferous conduct and attitude disrupted the orderly presentation of the memoranda by Brown and Lawhorn.

The evidence for defendants supports their theory that plaintiff informed Brown and Lawhorn that he was against the policy and would not comply with it. Plaintiff's version of the matter differs from that of Brown and Lawhorn in that he contends that while he disagreed with the policy he would abide by it, until he could confer with his attorney. Some of the shift workers do not recall a positive stand by plaintiff that he would not cooperate but recall his vigorous opposition to the policy.

The evidence reflects that Brown and Lawhorn left the meeting and conferred with Hendrix about the matter. In this conference Brown and Lawhorn recommended that plaintiff be given administrative suspension and terminated on the basis of insubordination. Defendants' evidence shows further that Hendrix called plaintiff to his office where plaintiff reiterated his position that the policy was illegal and he would not follow it. At this point, plaintiff was advised by Hendrix that there was no recourse other than to terminate his employment. This was, accordingly, accomplished. Plaintiff's version of the matter is somewhat different. Plaintiff contends that he did not refuse to comply with the policy but, that, while he disagreed with the administration over the legality of the policy, he would abide by it pending advise from his attorney.

After considering all the evidence and circumstances surrounding the meeting at which plaintiff's employment was terminated the court finds that plaintiff's discharge was justified because of his refusal to carry out and abide by the policy established by duly authorized personnel of the Center.

On the other issues involved in the action, plaintiff submitted no evidence to support the fact that Blacks were paid at a lower rate than whites or that he was denied promotions or raises because of his color. Data concerning the names, race, sex, rate pay and date of hire of all employees of the Center was placed into evidence by defendants. This data in no way reflected a disparate pay scale for Black employees. Generally, the evidence showed that as of the date of the hearing on this cause, there were 260 fulltime and part time employees at the Center. Of this number, 157 or approximately 60.15% were white; approximately 39.46% or 103 were Black; and approximately .39% or 1 was categorized as other. In the specific department where plaintiff was employed, there were as follows: a total of 123 employees, of those 123, there were approximately 46.34% or 57 whites, approximately 52.84% or 65 Blacks, and .0082% or 1 was categorized as other.

Since the opening of the Center, there had been approximately 94 promotions.

Approximately 56.38% or 53 white; approximately 43.61% or 41 were black. Of the total promotions of 94, a total of 68 or 72.34% involved promotion of an employee from the department in which plaintiff was employed, of those, 52.94% or 36 were white employees; 47.05% or 32 were black employees. All employees within the Center were paid in compliance with the minimum wage law requirements for those hourly paid positions and were in compliance with merit system rules and regulations for classified positions.

Plaintiff, during the hearing on this matter, presented no evidence of there having been practiced against him any racial discrimination; nor, did he present any evidence of racial discrimination against blacks in general. Further, defendant's evidence supports a finding that they had engaged in a very active and successful affirmative action program, directed at increasing black representation on their work force at all levels.

■ Plaintiff charges, however, that his dismissal for insubordination was staged, arranged and carried out in retaliation for the filing of charges by him with the EEOC of racial discrimination in the employment practices of the Center. The evidence in the action does not support this contention. While the dismissal came on the heel, so to speak, of the filing of charges, the evidence is clear that plaintiff vigorously voiced an opinion that he was entitled to leave the premises during work hours, regardless of the policy of the Center. Employers have the right to establish reasonable policies to govern the conduct of employees, and, if the policies are not arbitrary, unreasonable, or capricious, employees must comply with them as a condition of employment. The policy established by the Center under consideration, is not, in the opinion of the court, arbitrary, unreasonable, or capricious.

■ Where, as here, plaintiff's discharge was not motivated by racial considerations, or in retaliation for the filing of charges against the Center with EEOC, but the result of insubordination in plaintiff's re-

fusal to submit to legitimate exercises of lawful authority, plaintiff is not entitled to prevail. *Swint v. Pullman Standard,* 539 F.2d 77, 105 (5th Cir. 1976). The complaint must be dismissed on the issue concerning plaintiff's discharge.

On the other issues presented by the pleadings and the evidence, plaintiff has wholly failed to sustain the burden of proving that defendants in the operation of the Center have discriminated on the basis of race against him, or any other member of the black race, in employment, assignment, promotion, rate of pay, classification, or any other area of employment, in the operation of the Center. Plaintiff must also fail on these issues.

In sum, the court finds the plaintiff has not sustained the allegations of the complaint by evidence supporting them, and he is not entitled to recover anything, nor is he entitled to any relief from defendants, or any of them.

The clerk will enter a final judgment in favor of defendants, plaintiff to be taxed with the costs.